AO 106A  (08/18)  Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

for the

Central District of Illinois

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>4801 W. CLOSEN ROAD<br>BELLEVUE, ILLINOIS | )<br>)<br>)<br>)<br>)<br>) |

Case No. 20-mj-

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A

located in the    Central    District of    Illinois    , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 USC 2252A(a)(5)(B) | Possession of Child Pornography |
| 18 USC 2252A(a)(2) | Receiving or Distributing Child Pornography |

The application is based on these facts:

See Attached Affidavit

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

s/Scott Gamboe

*Applicant's signature*

Scott Gamboe, Task Force Officer, USSS

*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
telephone    *(specify reliable electronic means)*.

Date:  12/2/2020

City and state:  Peoria, IL

s/Jonathan E Hawley

*Judge's signature*

Jonathan E. Hawley, U.S. Magistrate Judge

*Printed name and title*

# UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS

IN THE MATTER OF THE SEARCH OF

4801 W. CLOSEN ROAD
BELLEVUE, ILLINOIS

Case No. 20-MJ-

**Filed Under Seal**

## AFFIDAVIT IN SUPPORT OF A SEARCH WARRANT

I, Task Force Officer Scott Gamboe, having been duly sworn, state the following:

## INTRODUCTION AND AGENT BACKGROUND

1.      I am a detective with the Peoria County Sheriff's Department, located in Peoria, Illinois and have been employed there from June 1998 to present. I am also a Task Force Officer through the sponsorship of the United States Secret Service (USSS) and a member of their Central and Southern Illinois Financial and Cyber Crime Task Force. I am a member of the United States Attorney's Office Central Illinois Cyber Crime Unit based in Peoria, Illinois.  I have received extensive training in criminal investigations, computer crime investigations, computer and electronic device forensic exams, identity theft, fraud, and child pornography investigations.  I have conducted numerous investigations, state and federal, involving computer crimes, identity theft, fraud, and child pornography resulting in arrests and seizures. I have also been involved in the execution of numerous search warrants.  In addition, I am an EnCE certified computer forensic examiner and a CCPA certified mobile device examiner. I hold a BA in Criminal Justice from the University of Illinois – Springfield.

2.      As a Task Force Officer with the U.S. Secret Service, I am authorized to investigate violations of United States laws and to execute warrants issued under the authority of the United States.  During such investigations, I have observed and reviewed numerous examples of child pornography (as defined in 18 U.S.C. § 2256) in all forms of media, including computer media.  I have been involved in numerous child pornography investigations and am very familiar with the tactics used by child pornography offenders who collect child pornographic material, and those who seek to exploit children.

3.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search:

a.   The premises known as 4801 W. Closen Road, Village of Bellevue, County of Peoria, State of Illinois (which is located in the Central District of Illinois), including the residence, any improvements thereto, appurtenances, any outbuildings of any kind associated with the premises, and any vehicles located on or in proximity to the listed residence and owned, controlled, or possessed by any occupant of the listed residence;

b.   The person of Daniel C. HIRSCH, date of birth 12-30-1984, SSN: 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, and any resident of the premises known as 4801 W. Closen Road;

c.   A gray 2005 Chevrolet Silverado, Illinois registration 1483672, VIN 1GCEC19V65Z251531; and

      d.  A maroon 2002 Jeep utility vehicle, Illinois registration 2792009, VIN

          1J4GL48K52W140459.

The locations and persons to be searched are further described below and in

**Attachment A** (which is incorporated herein by reference) and collectively referred to as

the SUBJECT PREMISES.

    4.      I request authority to search the SUBJECT PREMISES and all data and all

digital devices located at the SUBJECT PREMISES, including but not limited to

computers, mobile devices, tablets, cellular devices, digital/electronic storage media,

and all electronic data contained therein for items specified in **Attachment B** (which is

incorporated herein by reference) which may be found, and to seize all items listed in

Attachment B as contraband, evidence, fruits, and instrumentalities of a crime.

    5.      I am investigating the activities of Daniel C. HIRSCH. As set forth more

fully below, there is probable cause to believe that HIRSCH possessed, received, and/or

distributed child pornography, in violation of Title 18 U.S.C. § 2252A(a):

      a.  18 U.S.C. § 2252A(a)(2) prohibits knowingly receiving or

          distributing any child pornography that has been mailed or

          shipped or transported in interstate or foreign commerce by any

          means, including by computer.

      b.  18 U.S.C. § 2252A(a)(5)(B) prohibits a person from knowingly

          possessing any book, magazine, periodical, film, videotape,

          computer disk, or other material that contains an image of child

          pornography that has been mailed, shipped, or transported in

interstate or foreign commerce by any means, including by

computer, or that was produced using materials that have been

mailed, shipped or transported in interstate or foreign commerce

by any means, including by computer.

6.      Based on the facts as set forth in this affidavit, I respectfully submit that

there is probable cause to believe that contraband, evidence, fruits, and

instrumentalities, or property designed for use in committing a crime, namely

violations of 18 U.S.C. §§ 2252A(a)(2) and (a)(5)(B), are located at the SUBJECT

PREMISES.

7.      This affidavit is based on information I have gained from my

investigation, as well as information provided by other law enforcement agents and

others involved in this and other investigations.  Because I am submitting this affidavit

for the limited purpose of securing the requested search warrant, I have not included

each and every fact known to me concerning this investigation.  Instead, I have set forth

only the facts that I believe are necessary to establish probable cause to believe that

contraband, evidence, fruits and/or instrumentalities of violations of, or property

designed for use in violating 18 U.S.C. § 2252A(a)(5)(B) (possession of child

pornography), and 18 U.S.C. § 2252A(a)(2) (distribution of child pornography), are

located at the SUBJECT PREMISES.

## DEFINITIONS

8.     The following definitions, inclusive of all definitions contained in 18

U.S.C. § 2256, apply to this affidavit and Attachment B:

a.  "Computer" refers to "an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical, arithmetic, or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device."  18 U.S.C. § 1030(e)(1).

b.  "Computer hardware" consists of all equipment that can receive, capture, collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, or similar computer impulses or data. Computer hardware includes any data-processing devices (including, but not limited to, central processing units, internal and peripheral storage devices such as fixed disks, external hard drives, floppy disk drives and diskettes, and other memory storage devices); peripheral input/output devices (including, but not limited to, keyboards, printers, video display monitors, and related communications devices such as cables and connections); as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (including, but not limited to, physical keys and locks).

c.  "Computer passwords and data security devices" consist of information or items designed to restrict access to or hide computer software, documentation, or data. Data security devices may consist of hardware, software, or other programming code. A password (a string of alpha-numeric characters) usually operates what might be termed a digital key to "unlock" particular data security devices. Data security hardware may include encryption devices, chips, and circuit boards. Data security software of digital code may include programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched. Data security software or code may also encrypt, compress, hide, or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the progress to restore it.

d. "Computer-related documentation" consists of written, recorded, printed, or electronically stored material that explains or illustrates how to configure or use computer hardware, computer software, or other related items.

e. "Computer software" is digital information that can be interpreted by a computer and any of its related components to direct the way it works. It commonly includes programs to run operating systems, applications, and utilities.

f. "Internet Protocol Address" or "IP Address," as used herein, refers to a unique number used by a computer to access the Internet. IP Addresses can be "dynamic," meaning that the Internet service provider assigns a different unique number to a computer every time it accesses the Internet. IP Addresses might also be "static," if an Internet service provider assigns a user's computer a particular IP Address that is used each time the computer accesses the Internet. IP Addresses are registered to specific individuals or entities, such as an Internet service provider. When a subscriber of an Internet service provider wishes to access the Internet via their service, the Internet service provider will assign that account an IP Address which identifies that account holder on the Internet. By providing the Internet service provider with the dates, times and IP Addresses which a suspect used to access the Internet, the Internet service provider will be able to provide the identifying information for the account holder who was assigned that specific IP Address, at that date and time, if the records still exist on their system.

g. "Internet service providers" ("ISPs"), as used herein, are commercial organizations that are in business to provide individuals and businesses access to the Internet. ISPs provide a range of functions for their customers including access to the Internet, web hosting, e-mail, remote storage, and co-location of computers and other communications equipment.

h. The terms "records," "documents," and "materials" include all information recorded in any form, visual or aural, and by any means,

such as electrical, electronic or magnetic form (including, but not limited to, tape recordings, compact discs, hard disks, CD-ROMs, digital video disks (DVDs), Multi Media Cards (MMCs), memory sticks, optical disks, printer buffers, smart cards, or electronic notebooks, as well as digital data files from any magnetic, electrical or electronic storage device).

## BACKGROUND ON COMPUTERS, DIGITAL MEDIA & CHILD PORNOGRAPHY

9.　　Based on my knowledge, training, and experience in child exploitation and child pornography investigations, computers, computer technology, other digital electronic storage devices, and the Internet have revolutionized the manner in which individuals seek to access and exploit children, as well as their ability to produce, distribute, and collect child pornography. Moreover, with the advancement of so-called "smart" mobile phones, which perform the same functions, and often employ the same programs, as computers, users are able to transport, conceal, and have almost constant access to the Internet. Smart phones also enable consistent and real-time communication over a number of electronic, audio, and video platforms.

10.　　Computers and other digital electronic media basically serve five functions in the realm of child pornography and child exploitation: production, communication, distribution, storage, and social networking.

11.　　Child pornographers can transpose photographic images from a film camera into a computer-readable format with a scanner. With digital cameras, the images can be transferred directly onto a computer, and other digital media. A modem allows any computer to connect to another computer through the use of telephone,

cable, or wireless connection.  Through the Internet, electronic contact can be made to literally millions of computers around the world.

12.     The computer's ability to store images in digital form makes the computer itself an ideal repository for child pornography.  The size of the electronic storage media (commonly referred to as the hard drive) used in home computers has grown tremendously within the last several years.  These drives can store thousands of images at very high resolution.  In addition, electronic devices such as smart phones (e.g., Apple iPhones), connected devices (e.g., Apple iTouch), e-readers, and tablets (e.g., Apple iPads, Kindle Fire) now function essentially as computers with the same abilities to store images and videos in digital form.

13.     The Internet affords collectors of child pornography several different venues for obtaining, viewing, and trading child pornography in a relatively secure and anonymous fashion.

14.     Collectors and distributors of child pornography also use online resources to retrieve and store child pornography, including services offered by Internet portals such as Yahoo! and Hotmail, among others.  The online services allow a user to set up an account with a remote computing service that provides email services as well as electronic storage of computer files in any variety of formats.  A user can set up an online storage account from any computer or device with access to the Internet. Evidence of such online storage of child pornography is often found on the user's computer or device. Even in cases where online storage is used, in most cases evidence of child pornography can be found on the user's computer or device.

15.     As with most digital technology, communications made from a computer are often saved or stored on that computer.  Storing this information can be intentional, for example, by saving an email as a file on the computer or saving the location of one's favorite websites in "bookmarked" files.  Digital information can also be retained unintentionally.  Traces of the path of an electronic communication may be automatically stored in many places, such as temporary files or ISP client software, among others.  In addition to electronic communications, a computer user's Internet activities generally leave traces in a computer's web cache and Internet history files.  Computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a hard drive, deleted, or viewed via the Internet.  Electronic files downloaded to a hard drive can be stored for years at little or no cost.  Even when such files have been deleted, they can be recovered months or years later using readily available forensic tools.  When a person "deletes" a file on a home computer, the data contained in the file does not actually disappear; rather, that data remains on the hard drive until it is overwritten by new data.  Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space – that is, in space on the hard drive that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space – for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.  Similarly, files that have been viewed via the Internet are automatically downloaded into a temporary Internet directory or "cache." The browser typically maintains a fixed amount of hard drive space devoted to

these files, and the files are only overwritten as they are replaced with more recently

viewed Internet pages.  Thus, the ability to retrieve residue of an electronic file from a

hard drive depends less on when the file was downloaded or viewed than on a

particular user's operating system, storage capacity, and computer habits.

16.     Because the attempted enticement and coercion of minors is illegal, as is

the production, receipt, distribution, and possession of child pornography, individuals

who seek sexual gratification from the exploitation of children must be cautious about

their communications and online activity.  An individual can use the computer or other

digital electronic media in the privacy of his/her own home or office to locate and

interact with other like-minded individuals, including individuals trading in child

pornography.  Moreover, an individual can do so without revealing his/her true

identity.  The use of computers and other digital electronic media devices provide

individuals interested in child exploitation with a convenient method of storing their

communications, information about the others with whom they communicate, and their

child pornography collections.

17.     Searches and seizures of evidence from smart phones, computers, and

other digital devices commonly require agents to download or copy information from

the device to be processed later by a qualified computer expert in a laboratory or other

controlled environment.  This is almost always true because of the following three

reasons:

a.  Computers, smart phones and computer storage devices (like hard

disks, diskettes, tapes, laser disks, magneto opticals, and others) can

store the equivalent of thousands of pages of information. When the user wants to conceal criminal evidence, he or she often stores it in random order with deceptive file names. This requires searching authorities to examine all the stored data that is available in order to determine whether it is included in the warrant that authorizes the search. This sorting process can take days or weeks, depending on the volume of data stored, and is generally difficult to accomplish on-site.

b. Searching digital devices for criminal evidence is a highly technical process requiring expert skill and a properly controlled environment. The vast array of hardware and software available requires even computer experts to specialize in some systems and applications, so it is difficult to know before a search which expert should analyze the system and its data.

c.  The search of a computer system, and other digital devices, is an exacting scientific procedure that is designed to protect the integrity of the evidence and to recover even hidden, erased, compressed, password-protected, or encrypted files. Since this evidence is extremely vulnerable to tampering or destruction (which may be caused by malicious code or normal activities of an operating system), the controlled environment of a laboratory is essential to its complete and accurate analysis.

18.    Based on my own experience and consultation with other agents who have been involved in the search of computers and retrieval of data from computer systems and related peripherals, and computer media, it is common for such items to be transported or stored in motor vehicles.  Further, it is common for such items to be stored in common storage areas of a residence, including garage areas when those devices have been broken or replaced by newer equipment.  Further, even when these digital media devices have been stored for months or years, digital evidence can often be recovered from them.

## INTERNET PROTOCOL ADDRESS

19.    The Internet is a worldwide system of computer networks - a network of networks - in which users at any one computer can, if they have permission, get information from any other computer (and sometimes talk directly to other computer users).

20.    An Internet Protocol address (also known as an IP address) is a set of numbers which identify a computer on the Internet.  Standard IPV4 IP addresses follow the format of ###.###.###.###  wherein each of the numbers are between 0 and 255. Computers use IP addresses to identify each other on the Internet. Internet Protocol addresses are registered to specific individuals or entities, such as an Internet service provider.

21.    When a subscriber of an Internet service provider wishes to access the Internet via their service, the Internet service provider will assign that account an IP

address which identifies that account holder on the Internet.  By providing the Internet

service provider with the dates, times and IP addresses which a suspect used to access

the Internet, the Internet service provider will be able to provide the identifying

information for the account holder who was assigned that specific IP address at that

date and time, if the records still exist on their system.

### USING THE SHA-1 ALGORITHM TO UNIQUELY IDENTIFY FILES

22.     I am aware that when a user on some peer-to-peer networks offers a file to

trade, the peer-to-peer software calculates a "hash value" of the file using the hash

function known as SHA-1. A hash function is a mathematical function which converts

the data comprising the contents of a file into an alpha-numeric value.  An example of a

SHA-1 hash value is "86F7E437FAA5A7FCE15D1DDCB9EAEAEA377667B8." The SHA-

1 hash value is unique to every file. A person may copy a file and rename it, but if it is

an exact copy, regardless of the name of the file, it will have the same hash value as the

original.

23.     I am aware that the Secure Hash Algorithm (SHA) was developed by the

National Institute of Standards and Technology (NIST), along with the National

Security Agency (NSA), for use with the Digital Signature Standard (DSS) as specified

within the Secure Hash Standard (SHS). The United States of America has adopted the

SHA-1 hash algorithm described herein as a Federal Information Processing Standard.

24.     I am aware that digital files can be processed by this SHA-1 function

resulting in a hash value.  By comparing these hash values your Affiant can conclude

that two files are or are not identical with a precision that greatly exceeds 99.9999

percent certainty.  I am aware through the computer forensic community that there has never been a documented occurrence of two different files being found on the Internet having different contents while sharing the same SHA-1 hash value.

25.     SHA-1 is similar to the fingerprint, or DNA, of a digital file. SHA-1 is more accurate than DNA.  This allows an investigator to examine the SHA-1 hash values of files being traded on the peer-to-peer network and determine if they are the same as the hash value of a known file of child pornography.   The investigator is able to do this by comparing the hash value associated with a file offered on the peer-to-peer network with hash values known to be associated with movies or images of child pornography from previous investigations. These known movies or images of child pornography are maintained in libraries or databases kept by law enforcement investigators.

**PEER-TO-PEER FILE SHARING NETWORKS**

26.     On the Internet, peer-to-peer (commonly referred to as "P2P") is a type of Internet network that allows a group of computer users with the same networking software to connect with each other and directly access files from one another's hard drives or removable media. "Ares Galaxy" and "eMule" are examples of peer-to-peer client-networking software.  The popularity of peer-to-peer file trading programs has exploded in recent years as users began to use such networks to trade music files, e.g., MP3 files.  Although most popular for trading music, television shows and movies, the peer-to-peer networks also provide a viable method for trading child pornography.

There are several peer-to-peer networks currently operating, one of these being

Gnutella 2 (hereinafter referred to as "G2").

27.    Users of peer-to-peer software can search the peer-to-peer network by

entering search terms into their peer-to-peer client software to generate a list of

available files that contain the search terms.    For example, a user searching for music

could enter a song name, album name, artist name or genre.    The peer-to-peer client

software will then search the network for files which contain those terms in the file

name or file description.    The user then receives a list of files where the terms in the file

name or file description match the search terms entered by the user.    The user can select

one or more of the files and download them from users who possess at least a portion of

the desired file. These users can receive pieces of the selected file from numerous

sources at once. Once received, the pieces are then reassembled into the entire selected

file. Much as a user can enter search terms to search for music, television shows or

"mainstream" movies, users can also enter search terms to search for child pornography

images and/or movies.

28.    Users of such peer-to-peer software typically do not "share" all of the files

on their hard drive with other users of the peer-to-peer software.    Most peer-to-peer

client software will allow users to designate a specific folder or folders as "shared"

folders.    Any files contained in those specific folder or folders are then made available

for download by other users on the peer-to-peer network.

29.    File trading through peer-to-peer clients such as "Shareaza", "G2", and

"eMule" can only occur by means of a download.    That is, when a user wishes to obtain

a specific file, they will select that file and direct their client software to download the file from other users.  It is not possible for other users to "upload" files to another person's computer.

30.     Through my training and experience, I am aware that the same file can have different names even though the contents of the files are identical.  For example, an identical copy of the movie "Caddyshack" could be named "Caddyshack.mpg" on one user's computer and could be named "Bill Murray - Caddyshack.mpg" on another user's computer. Therefore, the peer-to-peer network needs to know which files made available through the peer-to-peer network are identical in order to acquire the different parts of the files and reassemble them on the local computer.  The peer-to-peer software verifies that the files are identical using Secure Hash Algorithm (SHA-1).

**PEER-TO-PEER DATABASE**

31.     I am aware that that cooperating law enforcement agencies pool their information to assist in identifying criminal conduct and build probable cause to further criminal investigations. With this pooled information law enforcement gets a better understanding of the global information available about a suspect that resides in their jurisdiction. This information is valuable when trying to regionalize a suspect to a certain jurisdiction, given the global scope of the Internet.

32.     I am aware that investigators from around the world gather and log information regarding child pornography trading on the peer-to-peer networks, and this information is kept in a database for use by law enforcement (hereinafter "peer-to-peer database").

33.      When an investigator logs onto the peer-to-peer network and enters search terms used by traders of child pornography, the investigator identifies a file that he or she believes to be child pornography.  The investigator then looks at or "browses" the contents of the shared folder to examine other files which the other user is currently sharing.  This "browse" function confirms that the particular computer is on-line and offering to share files at that moment. The investigator then initiates a download of the child pornography file. Once the investigator begins to download the file from that user, other computers which are also sharing the same child pornography file (as determined by an identical SHA-1 hash value) are identified. The investigator's software logs information pertaining to those computers including the IP address of each computer, the date and time and time zone that the child pornography file was shared by each computer, the SHA-1 hash value of the child pornography file and the file name of the child pornography file.  This information is then automatically sent to the peer-to-peer database. Therefore, there is a historical record of computers that have offered that child pornography file for download.

34.      Based on my training and experience, along with the training and experience of other law enforcement officers that I have consulted, I am aware that over one hundred search warrants have been executed using the above method of investigation.  This method has proven to be extremely reliable in determining the location of computers that were involved in the trading of child pornography through peer-to-peer networks.  When investigators have used this method of investigation, nearly every case was verified through the following means:

a. Evidence of child pornography was found on the computer.

b. Interviews of persons using those computers verified that child pornography had been present at one time on those computers.

c. If no images of child pornography were found on the computer, interviews of persons using those computers verified that child pornography had been present at one time but had been deleted or the computer with the child pornography had been removed from the premises.

d. Investigators found that images had been moved from the computer and stored on other media.

## PROBABLE CAUSE

35.     As a member of the Internet Crimes Against Children (ICAC) task force, I am trained and licensed in the use of the software used to access the peer-to-peer database and associated software.

36.     Beginning on or about September 15, 2020, I accessed the GridCops website to access one of the law enforcement peer-to-peer databases.  This was done utilizing the Child Protection System ("CPS") suite of tools.  CPS suite of tools is a user-friendly system, harnessing the power and abilities of thousands of investigators working together in keeping and logging information through law enforcement servers, which are located in Boca Raton, Florida, and owned by the Office of the State Attorney, 15th Judicial Circuit.  CPS was created by, at the direction of, and remains maintained by law enforcement.  It is used by federal, state and local law enforcement agencies in child

exploitation investigations worldwide. CPS maintains a log of IP addresses that have

been previously involved in the possession and distribution of child pornography.

37.    Throughout the investigation, while looking at the CPS tools, I found IP

Address 73.50.179.196 was last logged on at various dates and times, and the CPS tools

indicated the presence of files listed in the database discussed below. This IP Address

was reported to be located in the area of Peoria, IL, and was held by Comcast Cable

Communications.

38.    One tool in the CPS suite is designed to operate on the various peer-to-

peer networks, but in a manner different from a normal user. Rather than downloading

target files from multiple computers, the software enables an investigator to identify

files being offered for download from one specific IP Address. Such files are identified

by comparing the SHA-1 hash values of files offered for download, to the SHA-1 hash

values of known child pornography files held in the peer-to-peer database. In this way,

it can be stated with absolute certainty that a computer that was accessing the peer-to-

peer network through the listed IP Address offered to distribute a file(s) containing

images of child pornography. The device(s) using the IP Address 73.50.179.196 to access

the peer-to-peer file sharing software was using the G2 network.

39.    As of 1200 hours (Central Time) on November 18, 2020, the device(s)

accessing the G2 network from the IP Address 73.50.179.196 had been seen with 61 files

whose SHA-1 hash values were listed in the peer-to-peer database as containing child

pornography. I compared these files' hash values to the hash values in a library

provided to me by the ICAC task force. I located four files in my library with SHA-1

hash values matching those being offered by the device(s) using this IP Address. Those files are described herein:

    a.  Hash value IA3AZXRKNX6FR2DAPD43QIUI3PWFGPSU: This video was 7 minutes in length and depicted a clothed adult male kissing a nude prepubescent female and pulling on her ponytail. The female then performs oral sex on the male. The CPS tool listed the filename as "IZZ1B(rare only for special trade- 6.30min)9yo girl.mpg". This file was observed being offered for distribution from the listed IP Address on August 31, 2020 at 1132 hours UTC.

    b.  Hash value U6CAGM7TDW3P7YJCXSEHOA3QELXFXRIE: This video was 2 minutes and 46 seconds in length and depicted an adult male using his penis to vaginally penetrate a preteen female who is nude from the waist down. The filename listed in the CPS tool was "[ www.jailbaits.tv] PTHC 2012 – 11yo Katerin Enjoy Pussy Fuck (Venezuela), preteen,loli,bibcam,ptsc,new,cum,9yo,10yo.avi". This file was observed being offered for distribution from the listed IP Address on August 29, 2020 at 0928 hours UTC.

    c.  Hash value VT44CGT66XBK5H5HRX7CFHX6YMT4CT2E: This video was 15 minutes and 26 seconds in length. In the lower left corner of the screen is a watermark for the website "LS-Magazine", which is known to law enforcement to portray preteen and

prepubescent females in the nude and/or in lingerie. This video depicted a prepubescent female and a preteen female who remove their clothes, groom each other, and expose their nude breasts and genitals to the camera. At times, their nude genitals are the focal point of the video. The CPS tool listed the filename as "ls-magazine Valya PedoMom kiddy porn kidzilla 07YO Toddler Girl 10YO boy.avi". This file was observed being offered for distribution from the listed IP Address on September 11, 2020 at 0706 hours UTC.

d.  Hash value ZT5EUAKURFTGBPA7NS75UP4NTOLSGDU6: This video was 7 minutes and 49 seconds in length, and depicted a 12-14-year-old female who exposes her breasts, masturbates an adult male, then performs oral sex on him. The filename listed on the CPS tool was "[pthc] 12y Evelin (Suriname, 2009) Tits, Handjob, Blowjob, Cumshot ~~~ prostitute opva 2014 pedo latina 11y 13y novinha 14y children kids porn.avi". This file was observed being offered for distribution from the listed IP Address on August 31, 2020 at 1035 hours UTC.

40.  Since September 11, 2020, the CPS tool has logged the IP Address 73.50.179.196 accessing the G2 network and offering to distribute files containing depictions of child pornography on multiple occasions. This includes incidents on November 9, 15, and 18, 2020. Although the files offered for distribution were listed as known files in the CPS tool, none of the files from the November 2020 incidents were in

my ICAC library. However, the filenames associated with these files are indicative of files containing depictions of child pornography, including:

    a. On November 9, 2020:

        i. The file "(PHANT)—German Girl 11yo fuck GGG PTHC 2020.mp4";

        ii. The file "[JulyJailbait.nl] – 11yo Russian suck (amateur pthc blowjob).mp4";

        iii. The file "PTHC Creampie – little girls get pumped full of cum 9yo 10yo 12yo 14yo qqcp pussy vagina anal r@ygold fuck hussyfan kdquality pscn pedo bambina.mp4".

    b. On November 15, 2020:

        i. The file "hot babe gets naked 11yo raped children in cinema young girls preteen orgy ptsc bd company lesya zip.avi".

    c. On November 18, 2020:

        i. The file "_00  (She s eaten out, then bj then 69 then doggy rub fuck 16m30s) (pthc) NEW 2017 Pedo Childlover 8yo Daddy s Little Girl JM 11.mp4".

41.　　During the course of an investigation involving child exploitation material, law enforcement frequently encounters certain terms within filenames. These certain terms are known to have specific references to images of child pornography. The terms "11y", "12y", "11yo", "12yo", and so on, are known to law enforcement to refer to the ages of the child victims portrayed in the files ("11 years old", "12 years old"). Two

1:20-mj-06138-JEH   # 1   Page 24 of 34

terms that reference the type of content in a file are "PTHC" ("Pre-Teen Hard Core") and "PTSC" ("Pre-Teen Soft Core"). The term "loli" is an abbreviation of "Lolita", which is a reference to the nickname of a 12-year-old female character in the novel by the same name (written by Vladmir Navokov); this 12-year-old female becomes romantically involved with her step-father. The term "r@ygold" refers to a series of child pornography files attributed to a single producer, similar to a "brand" name. The term "pedo" is an abbreviation for "pedophile".

42.     On September 15, 2020, I submitted an administrative subpoena to Comcast Cable Communications, the holder of the IP Address 73.50.179.196. The response indicated that on September 11, 2020, at 0700 hours (when this IP Address was observed offering to share files containing child pornography), the IP Address was assigned to a residence at 4801 W. Closen Road in Peoria, IL. This location is actually in the village of Bellevue, Illinois, but since Bellevue does not have a US Post Office branch, the mailing address at this location is listed as Peoria. This location is in the Central District of Illinois.

43.     Comcast further indicated that the holder of the account is Daniel HIRSCH.

44.     On November 19, 2020, I submitted another administrative subpoena to Comcast for the IP Address 73.50.179.196. The response indicated that on November 18, 2020, at 1056 hours UTC (when this IP Address accessed the G2 network while offering to share files known to contain child pornography), the IP Address was assigned to the

same residence and account holder: 4801 W. Closen Road, with an account holder named Daniel HIRSCH.

45.     On HIRSCH's Illinois driver's license, the address listed is 4801 W. Closen Road, Peoria, Illinois.

46.     According to data provided by the Illinois Secretary of State's Office, there are two vehicles with registration information indicating that the registered owner resides at 4801 W. Closen Road. The first is a gray 2005 Chevrolet Silverado with Illinois registration 1483672, and a VIN of 1GCEC19V65Z251531. The other is a maroon 2002 Jeep utility vehicle with Illinois registration of 2792009, and a VIN of 1J4GL48K52W140459. The registration information for both vehicles indicates that Jennifer Hirsch is the registered owner, and that she resides at 4801 W. Closen Road.

47.     On November 20 and December 1, 2020, I observed both vehicles to be parked at the residence at 4801 W. Closen Road. The gray 2005 Chevrolet Silverado with Illinois registration 1483672 was parked on the driveway, and the maroon 2002 Jeep utility vehicle with Illinois registration of 2792009 was parked just east of the residence.

## CONCLUSION

48.     Based on the above information, this affiant respectfully submits that probable cause exists to believe that the items described in Attachment B are presently located at the SUBJECT PREMISES, as set forth in Attachment A, and the digital media therein, and that said items constitute evidence and/or contraband of the federal

offenses in violation of 18 U.S.C. § 2252A(a)(5)(B) (possession of child pornography), and 18 U.S.C. § 2252A(a)(2) (distribution of child pornography).

49.     Accordingly, it is respectfully requested that the Court issue the proposed search warrant.

## REQUEST FOR SEALING

50.     I further request that the Court order that all papers in support of this application, including the affidavit and search warrant, be sealed until further order of the Court. These documents discuss an ongoing criminal investigation that is neither public nor known to all the targets of the investigation. Accordingly, there is good cause to seal these documents because their premature disclosure may give targets an opportunity to flee or continue flight from prosecution, destroy or tamper with evidence, change patterns of behavior, notify confederates, or otherwise seriously jeopardize the investigation.

s/Scott Gamboe

Task Force Officer Scott Gamboe

Sworn to me over the telephone and signed by me pursuant to Fed. R. Crim. P. 4.1 and 4(d) on this 2nd day of December, 2020.

s/Jonathan E Hawley

JONATHAN HAWLEY, Magistrate Judge
United States District Court

**Attachment A**
**Locations to be searched**

1. The premises known as 4801 W. Closen Road, Bellevue, Illinois (which is in the Central District of Illinois), further described as a tan, ranch-style single-family residence. This includes the residence, any improvements thereto, appurtenances, any outbuildings of any kind associated with the premises, and any vehicles located on or in proximity to the listed residence and owned, controlled, or possessed by any occupant of the listed residence. The red bubble in the photo below indicates the location of the residence.



The front of the residence at 4801 W. Closen Road is indicated in this photo.



2. The person of Daniel C. HIRSCH, M/W, DOB 12-30-1984, SSN: 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, if located within the Central District of Illinois, shown below in his Illinois Driver's License Photo:



The search will also include the person of any resident of 4801 W. Closen Road, if located within the Central District of Illinois.

3. A gray 2005 Chevrolet Silverado, Illinois registration 1483672, VIN 1GCEC19V65Z251531, depicted in the below photo.



4. A maroon 2002 Jeep utility vehicle, Illinois registration 2792009, VIN 1J4GL48K52W140459, depicted in the below photo.



**Attachment B**
**Description of items to be seized**

1.      Any and all computers, network routers, cellular phones, mobile devices, tablets, flash drives, or other items of digital media to include electrical, magnetic, and optical digital media.

2.      Any and all notes, documents, records, or correspondence, in any format and medium (including, but not limited to, envelopes, letters, papers, e-mail messages, chat logs and electronic messages, and handwritten notes) pertaining to the possession, receipt, or distribution of child pornography as defined in 18 U.S.C. § 2256(8).

3.      In any format and medium, all originals, computer files, copies, and negatives of child pornography as defined in 18 U.S.C. § 2256(8), visual depictions of minors engaged in sexually explicit conduct as defined in 18 U.S.C. § 2256(2), or child erotica.

4.      Any and all diaries, address books, names, and lists of names and addresses of individuals who may have been contacted by the use of the computer or by other means for the purpose of distributing or receiving child pornography as defined in 18 U.S.C. § 2256(8) or visual depictions of minors engaged in sexually explicit conduct as defined in 18 U.S.C. § 2256(2).

5.      Any and all notes, documents, records, or correspondence, in any format or medium (including, but not limited, to envelopes, letters, papers, e-mail messages, chat logs and electronic messages, and handwritten notes), identifying persons transmitting, through interstate or foreign commerce by any means, including, but not

limited to, by the United States Mail or by computer, any child pornography as defined in 18 U.S.C. § 2256(8).

6.      Any and all notes, documents, records, or correspondence, in any format or medium (including, but not limited, to, envelopes, letters, papers, e-mail messages, chat logs and electronic messages, other digital data files and web cache information) concerning the receipt, transmission, or possession of child pornography as defined in 18 U.S.C. § 2256(8) or visual depictions of minors engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256(2).

7.      Any and all notes, documents, records, or correspondence, in any format or medium (including, but not limited to, envelopes, letters, papers, e-mail messages, chat logs and electronic messages, and other digital data files) concerning communications between individuals about child pornography or the existence of sites on the Internet that contain child pornography or that cater to those with an interest in child pornography.

8.      Any and all records, documents, invoices and materials, in any format or medium (including, but not limited to, envelopes, letters, papers, e-mail messages, chat logs and electronic messages, and other digital data files) concerning membership in online groups, clubs, or services that provide or make accessible child pornography to members.

9.      Any and all records, documents, invoices and materials, in any format or medium (including, but not limited to, envelopes, letters, papers, e-mail messages, chat

logs and electronic messages, and other digital data files) that concern any accounts with an Internet Service Provider.

10.     Any and all records, documents, invoices and materials, in any format or medium (including, but not limited to, envelopes, letters, papers, e-mail messages, chat logs and electronic messages, and other digital data files) that concern online storage or other remote computer storage, including, but not limited  to, software used to access such online storage or remote computer storage, user logs or archived data that show connection to such online storage or remote computer storage, and user logins and passwords for such online storage or remote computer storage.

11.     Any and all cameras, enclosed memory card, or other photographic equipment.

12.     Any and all visual depictions of minors, regardless of format.

13.     Any and all address books, mailing lists, supplier lists, mailing address labels, and any and all documents and records, in any format or medium (including, but not limited to, envelopes, letters, papers, e-mail messages, chat logs and electronic messages, and other digital data files), pertaining to the preparation, purchase, and acquisition of names or lists of names to be used in connection with the purchase, sale, trade, or transmission, through interstate or foreign commerce by any means, including by the United States Mail or by computer, any child pornography as defined in 18 U.S.C. § 2256(8) or visual depictions of minors engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256(2).

14.     Any and all diaries, notebooks, notes, and any other records reflecting personal

contact and any other activities with minors visually depicted while engaged in

sexually explicit conduct, as defined in 18 U.S.C. § 2256(2).

15. Any and all notes, documents, records, correspondence or other items, in any format

or medium, reflecting indicia of occupancy or residence.

16. For any computer or storage medium whose seizure is otherwise authorized by this

warrant, and any computer or storage medium that contains or in which is stored

records or information that is otherwise called for by this warrant (hereinafter,

"COMPUTER"):

      a.  evidence of who used, owned, or controlled the COMPUTER at the time

          the things described in this warrant were created, edited, or deleted, such

          as logs, registry entries, configuration files, saved usernames and

          passwords, documents, browsing history, user profiles, email, email

          contacts, "chat," instant messaging logs, photographs, and

          correspondence;

      b.  evidence of software that would allow others to control the COMPUTER,

          such as viruses, Trojan horses, and other forms of malicious software, as

          well as evidence of the presence or absence of security software designed

          to detect malicious software;

      c.  evidence of the lack of such malicious software;

d.  evidence indicating how and when the computer was accessed or used to determine the chronological context of computer access, use, and events relating to crime under investigation and to the computer user;

e.  evidence indicating the computer user's state of mind as it relates to the crime under investigation;

f.  evidence of the attachment to the COMPUTER of other storage devices or similar containers for electronic evidence;

g.  evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the COMPUTER;

h.  evidence of the times the COMPUTER was used;

i.  passwords, encryption keys, and other access devices that may be necessary to access the COMPUTER;

j.  documentation and manuals that may be necessary to access the COMPUTER or to conduct a forensic examination of the COMPUTER;

k.  records of or information about Internet Protocol addresses used by the COMPUTER;

l.  records of or information about the COMPUTER's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses;

m. contextual information necessary to understand the evidence described in this attachment.